IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| KENNETH SWEETING, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:11cv00334 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| M. STANFORD, *et al.*, | ) | By: Norman K. Moon |
|     Defendants. | ) | United States District Judge |

Kenneth Sweeting, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants failed to provide him with adequate medical treatment for his eye and retaliated against him for filing this civil rights action.[1] Defendants have filed a motion to dismiss and Sweeting has responded, making this matter ripe for disposition. I find that Sweeting has not demonstrated that defendants acted with deliberate indifference to a serious medical need or that they retaliated against him. Therefore, I will grant defendants' motion to dismiss.[2]

**I.**

Sweeting was transferred to Wallens Ridge State Prison ("WRSP") on March 4, 2008. Three days after his arrival, on March 7, 2008, Sweeting notified staff that his right eye "felt funny" and that his vision in that eye was a "tad bit blurry." Sweeting states that he did not have any pain or strain in the eye at all. In response to his eye complaints, staff gave Sweeting a pair

---

[1] Sweeting also filed a motion (Docket No. 65) seeking to join Dr. Compton as a defendant to this action. In his motion, Sweeting does not state what claims he seeks to bring against Dr. Compton; however, to the extent he seeks to bring a claim concerning denial of adequate medical treatment based on the facts presented in his pleadings, for the reasons stated herein, I find that Sweeting has failed to state a constitutional claim against Dr. Compton because he has failed to demonstrate that Dr. Compton was deliberately indifferent to his eye problem. Therefore, I will deny Sweeting's motion as futile.

[2] Sweeting filed a motion (Docket No. 101) seeking default judgment because defendants did not respond to his response to their motion to dismiss. However, no response was due or required from defendants. Accordingly, I will deny Sweeting's motion.

of glasses to wear. On March 21, 2008, Sweeting was seen by defendant Dr. Compton, an optometrist who both visits inmates at WRSP and sees inmates in his offsite office. Dr. Compton examined Sweeting and documented his vision as 20/25+ in the right eye and 20/20 in the left eye. Sweeting does not complain of any other eye issues for the remainder of 2008.

Almost a year later, on February 12, 2009, Sweeting alleges that he could feel a "difference" in his eye and that his vision had slightly decreased. Sweeting states that he submitted a request to see medical and was seen the same day by Dr. Compton. Sweeting states that he did not have any eye pain at that time, but that he had a slight loss of right eye muscle control and his eye had begun to turn out slightly. Dr. Compton advised Sweeting that he had floaters in his eye and documented Sweeting's vision as 20/25+ in the right eye and 20/20 in the left eye. Upon Sweeting's inquiry, Dr. Compton also told Sweeting that he did not need eye surgery at that time. Sweeting does not complain of any other eye issues until the fall of 2009.

On October 14, 2009, Sweeting alleges that he began to feel strain in his right eye and that his vision had further decreased. Sweeting states that he saw Dr. Compton on the same day. Dr. Compton examined Sweeting's eyes and documented his vision as 20/60 in the right eye and 20/25 in the left eye. Dr. Compton also diagnosed Sweeting with strabismic amblyopia.[3] Dr. Compton indicated in medical records that, when Sweeting requested them, glasses could be ordered. Sweeting does not complain of any other eye issues for the remainder of 2009.

On March 17, 2010, Sweeting alleges that his "eye problem started getting serious." Sweeting alleges that his vision had become "very blurry," that he was straining to keep his right eye open, and that he was feeling "a little pain from the strain." Sweeting notes that the pain was not bad at that time, but that it was getting worse than it had been. Sweeting was examined by

---

[3] Amblyopia is a condition in which an eye does not develop vision normally and strabismus means that the eyes are misaligned. *Strabismus*, Penn Eye Care Sheie Eye Institute, http://www.pennmedicine.org/ophth/ conditions/strabismus.html.

2

defendant Dr. Repko, the WRSP optometrist, on the same day.  Dr. Repko acknowledged that Sweeting had intermittent strabismic amblyopia and recommended that Sweeting do "home vision therapy."

On July 13, 2010, Sweeting states that his right eye was causing him pain and was closed 80% of the time.  Sweeting alleges that the home vision therapy did not work.  Sweeting claims that in response to a medical request filed that day, he was informed that Dr. Repko would review his chart, but he did not hear from Dr. Repko afterward.

On July 22, 2010, Sweeting alleges that he filed another medical request explaining that he was losing his vision and muscle control.  A nurse responded to his request, advising him that Dr. Repko had scheduled Sweeting for an offsite eye doctor appointment.

On August 2, 2010, Sweeting states that he was sent offsite to visit Dr. Compton.  Dr. Compton noted that Sweeting's exotropia[4] was increasing in size and ordered a CT scan of Sweeting's brain and orbits.  Sweeting alleges that Dr. Compton told him that he had never seen a case like Sweeting's and that he did not understand it.  Dr. Compton noted that Sweeting had no restrictions and that he "may require" an eye patch to prevent diplopia, also known as double vision.  Dr. Compton scheduled Sweeting for a follow-up visit on November 4, 2010.

On August 3, 2010, Sweeting was sent to Mountain View Hospital for CT scan. According to Sweeting, his results came back negative and "nothing was wrong with [his] brain."

On August 16, 2010, Sweeting filed an informal complaint alleging that Dr. Compton had ordered an eye patch for him but that he had not yet received it.  Staff responded that there was no order for an eye patch in his medical file, that Sweeting was scheduled to see the doctor on

---

[4] Exotropia is a common type of strabismus and is the outward deviation of an eye away from the nose.  Dr. Jeffrey Cooper and Rachel Cooper, *All About Stabismus*, http://www.strabismus.org/exotropia_eye_turns_out.html.

September 10, 2010, and that if he needed to see the doctor before then, he should file a sick call request. Sweeting does not allege that he submitted a sick call request to see the doctor earlier. On September 7, 2010, Sweeting saw the WRSP general physician, who noted the inquiry, "[d]oes patient need eye patch?"

On September 29, 2010, Sweeting alleges that he could "hardly see out of" his eye, that he had lost more vision and muscle control, and that he was experiencing "severe sharp pains" and strain in his right eye. Medical records from the same day indicate that Sweeting advised Dr. Repko that he was not doing his eye exercises, as previously directed, and that Sweeting demonstrated periods of proper eye alignment during his appointment.[5] Dr. Repko gave Sweeting an eye patch to use when he is "unable to compensate for high phoria"[6] and advised him to continue doing home vision therapy.

On November 4, 2010, Sweeting had a follow-up appointment with Dr. Compton. Dr. Compton noted that Sweeting's CT scan was within normal limits and diagnosed Sweeting with "increasing exotropia with decreased vision." Dr. Compton recommended that Sweeting be referred to MCV "for a work-up."

On December 8, 2010, Dr. Repko called Sweeting to the medical unit to follow-up on Dr. Compton's diagnosis and recommendation. Dr. Repko prescribed Sweeting special glasses with a prism in them to see if they would provide Sweeting's some relief. Dr. Repko noted in Sweeting's medical records that Sweeting "may need evaluation at MCV" if the prism glasses

---

[5] In his response to defendants' motion to dismiss, Sweeting alleges that he did not do the eye exercises because they were too difficult given the condition of his eye.

[6] Phoria is misalignment of the eyes that is only apparent some of the time. T. Bedinghaus, O.D., *Phoria*, About.com Guide, May 11, 2010, http://vision.about.com/od/basicvision/g/Phoria.htm.

did not provide relief. Before he received the prism glasses, Sweeting filed an Offender Request for Information form indicating that the "glasses don't and won't work, I need surgery. . . ."

Sweeting states that he received the prism glasses sometime between December 8, 2010 and December 10, 2010. Sweeting alleges that after wearing the glasses for "a few hours," he stopped because they were causing him to see double and to be dizzy and nauseated.

Over the next few months, Sweeting complained several times that his vision and muscle control were still getting worse and that he was in pain. Sweeting repeatedly asked to be sent to MCV. In response, various WRSP staff told Sweeting that he needed to try wearing his prism glasses to see if they provided any relief before he would be referred to MCV. Staff also advised Sweeting that he had a follow-up visit with the eye doctor already scheduled.

On February 28, 2011, while Sweeting was in segregation, he alleges that defendant Dr. Thompson, a general physician at WRSP, walked by his cell. Sweeting claims that he asked Dr. Thompson to come over to his cell and when Dr. Thompson arrived, Sweeting showed him "the condition of [his] eye," which Sweeting alleges was "completely shut and in extreme pain." When Sweeting asked Dr. Thompson what he was going to do about the eye, Dr. Thompson allegedly responded "[m]an, you called me to your door for this?" and then he walked away. Records reflect that Dr. Thompson is not an eye doctor.

Sweeting then filed an emergency grievance on March 2, 2011, stating that his "eye problem" was causing him "tremendous pain" for three days, that he had lost muscle control, and that he had lost a "tremendous amount of vision." Staff responded the same day, advising Sweeting that his grievance did not meet the definition of an emergency and that he should submit a sick call.

Sometime between March 10, 2011 and March 12, 2011, Sweeting alleges that he saw Dr. Repko for a medical follow-up. At that time, Dr. Repko allegedly acknowledged that Sweeting's condition had grown worse and, therefore, recommended that he be sent to MCV for evaluation. Over the next several weeks, Sweeting complained multiple times about having not been sent to MCV yet. In response, staff told Sweeting that his appointment was scheduled for the first available time slot at MCV.

On May 4, 2011, Sweeting was transferred to Sussex I State Prison ("Sussex I") in order to attend his MCV appointment. On May 11, 2011, Sweeting went to his first MCV evaluation where he alleges they conducted an eye test. On July 19, 2011, Sweeting was transferred back to WRSP.

On September 1, 2011, Sweeting alleges that his eye "began bothering [him] again with sharp pains and strain." On September 18, 2011, Sweeting filed an informal complaint concerning his eye pain. In response, Sweeting was seen in the medical department by Dr. Thompson on September 21, 2011 and was scheduled to see the eye doctor the next time he was at WRSP. At his appointment with Dr. Thompson, Sweeting alleges that Dr. Thompson "rudely asked" him what was wrong. When Sweeting advised Dr. Thompson that his eye was causing him "extreme pain," he claims that Dr. Thompson and defendant Nurse Stanford "ridiculed him" and told him that he must be lying about the pain because strabismus does not cause pain.[7] Dr.

---

[7] To the extent Sweeting's allegations can be construed as a claim that the defendants violated his constitutional rights by ridiculing him, it fails. Verbal harassment or abuse by prison officials in and of itself does not state a constitutional deprivation under § 1983. *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)); *Johnson v. Laham*, 9 F.3d 1543 (4th Cir. 1993). The Constitution does not "protect against all intrusions on one's peace of mind." *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991). Verbal harassment or idle threats to an inmate, even to an extent that it causes an inmate fear or emotional anxiety, do not constitute an invasion of any identified liberty interest. *Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D. N.C. 1990), *aff'd* 917 F.2d 1302 (4th Cir. 1990) (finding that the threatening language of a prison official, even if true, does not amount to constitutional violation); *Bibbo v. Mulhern*, 621 F. Supp. 1018, 1025 (D. Mass. 1985) (humiliating, denigrating, and frightening verbal abuse may be actionable as state tort, but does not state a

Thompson ordered that Sweeting be moved to the medical unit so he could be placed under medical supervision. Sweeting was also advised that he was scheduled to have eye surgery at MCV in October. Sweeting states that he asked Dr. Thompson and Nurse Stanford to prescribe a pain reliever and that they refused, but Nurse Stanford told Sweeting to order an over-the-counter pain reliever from commissary. Sweeting alleges that Dr. Thompson and Nurse Stanford denied him pain medication because he filed this civil rights action. Sweeting states that he did not buy pain medication from the commissary because it is his "understanding that when an inmate has a serious medical problem or is feeling serious pain, it is the duty [of] the nurse or medical staff to provide such treatment. . . ."

On October 13, 2011, Sweeting was transferred back to Sussex I. On October 17, 2011, Sweeting went to MCV for evaluation. Sweeting alleges that the doctor at MCV diagnosed him with cataracts, but that the doctor failed to note it in his medical record. The doctor did, however, note his recommendation that Sweeting be given eye surgery for his exotropia.

On October 26, 2011, Sweeting had eye surgery at MCV. On October 27, 2011, Sweeting went back to MCV for a follow-up appointment. Sweeting alleges that since the surgery, his eye is better than it was before, but that it is "still in bad shape." Sweeting alleges that the MCV doctor overcorrected his eye (Sweeting states that he was warned that this might happen but nevertheless agreed to go through with the surgery). Sweeting states that his eye is straight now, but that he sees double when he looks to the right. When Sweeting told the MCV doctor about the double-vision, the doctor recommended glasses. On or around September 16, 2012, Sweeting was transferred back to WRSP.

---

Fourteenth Amendment claim). Accordingly, I find that Sweeting's allegations of harassment fail to state a claim of constitutional magnitude.

Sweeting alleges that the defendants have been deliberately indifferent and negligent to his serious medical need arising from his eye problems and that they retaliated against him for filing this civil rights action by denying him pain medication.[8]  Sweeting seeks $1.2 million in damages.

## II.

Sweeting alleges that the defendants denied him adequate medical care for his eye problems.  I find that Sweeting has not demonstrated that the defendants acted with deliberate indifference to his eye problems and, therefore, he has failed to state a claim of constitutional magnitude.[9]

---

[8] Throughout his pleadings, Sweeting makes several references suggesting that Nurse Stanford gives orders to all the doctors and nurses at WRSP and that she is ultimately responsible for his medical care at WRSP. However, I take judicial notice of the fact that nurses generally cannot prescribe treatment or overrule a doctor's orders, and Sweeting fails to direct the court to any evidence to the contrary. *See Chacon v. Ofogh*, No. 7:08cv46, 2008 U.S. Dist. LEXIS 68350, at *13 (W.D. Va. Aug. 21, 2008).

[9] In addition, I find that to the extent Sweeting seeks to sue defendants in their official capacities for monetary damages, his claims must be dismissed because such suits are not cognizable under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983.)

Defendants also raise the defense of qualified immunity.  I find that the defendants are entitled to qualified immunity as to Sweeting's claims for damages against defendants' in their individual capacities. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity shields a government official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.  Qualified immunity is an immunity from suit rather than a mere defense to liability.  Thus, whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by *Pearson v. Callahan*, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)).

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609.  If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).  As discussed herein, Sweeting has failed to present sufficient evidence to support his Eighth Amendment claim.  Accordingly, I find that the defendants are entitled to qualified immunity from Sweeting's claims for damages against them in their individual capacities.

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that jail officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Staples v. Va. Dep't of Corr.*, 904 F.Supp. 487, 492 (E.D.Va. 1995). To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of and disregard for an objectively serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rish v. Johnson*, 131 F.2d 1092, 1096 (4th Cir. 1997).

Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer*, 511 U.S. at 837. The officer's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Militier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). Unsuccessful medical treatment does not give rise to a § 1983 cause of action. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Further, the Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Lewis v. Lappin*, Nos. 3:10cv130, 3:10cv568, and 3:10cv684, 2011 U.S. Dist. LEXIS 120177, at *8 (E.D. Va. 2011). Treatment below the standard of care shows negligence, but negligence is not sufficient to establish a claim of deliberate indifference. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002); *Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995). Further,

9

questions of medical judgment are not subject to judicial review. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (citing *Shields v. Kunkel*, 442 F.2d 409 (9th Cir. 1971)).

Sweeting concedes that he has been seen and evaluated numerous times over the past several years by the defendants. Sweeting also acknowledges that the defendants have prescribed several different courses of treatment (including glasses, home vision therapy, an eye patch, and prism glasses) as well as run several tests (including multiple eye exams and a CT scan). Although he may disagree with the course of treatment he received, his claim is nothing more than a doctor-patient disagreement, which is not actionable under the Eighth Amendment. Further, to the extent Sweeting alleges that the defendants acted negligently, these allegations also are not actionable under the Eighth Amendment. Based on the foregoing, I find that Sweeting has not demonstrated that the defendants acted with deliberate indifference and, thus, Sweeting has failed to state a constitutional claim.[10]

### III.

Sweeting alleges that the defendants denied him pain medication in retaliation for him having filed this civil rights action. I find that Sweeting's bare assertion of retaliation is insufficient to state a constitutional claim.

It is well settled that state officials may not retaliate against an inmate for exercising his constitutional rights, including his right to access the courts. *See American Civ. Liberties Union v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993). However, in order to sustain a cognizable retaliation claim under § 1983, an inmate must point to specific facts supporting his

---

[10] To the extent Sweeting seeks to recover for the pain he allegedly suffered, I find that Sweeting has not demonstrated that the defendants acted with deliberate indifference. The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Snipes*, 95 F.3d at 592; *Lewis*, 2011 U.S. Dist. LEXIS 120177, at *8. At most, Sweeting's allegations concerning the defendants' failure to provide him with pain medication amount to a claim of negligence, which is not actionable under the Eighth Amendment.

claim of retaliation. *White v. White*, 886 F.2d 271 (4th Cir. 1989). "[B]are assertions of retaliation do not establish a claim of constitutional dimension." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (federal courts should regard inmate claims of retaliation with "skepticism").

In this case, Sweeting does not point to any facts that suggest that defendants' denial of pain medication was based on a retaliatory motive. Further, defendant Stanford recommended that Sweeting purchase pain medications from the commissary if he felt he needed them. Accordingly, I find that Sweeting's conclusory allegations of retaliation fail to state a claim on which relief may be granted.

## IV.

For the reasons stated herein, I will grant defendants' motion to dismiss.

**ENTER**: This 24th day of September, 2012.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE